ENOCH OPPEGAARD and Others v. BOARD OF COMMIS-
SIONERS OF RENVILLE COUNTY.[1]

February 7, 1913.

Nos. 17,899—(167).

**Change of school district — jurisdiction of district court to modify order.**
    Where, upon a petition, filed under the proviso of Laws 1907, c. 188, for
    the enlargement of a school district, the county board in rearranging the
    districts affected by the change, included in one of the districts land situated
    in another, under the belief that the same already belonged to the former,
    such land, furthermore, not being mentioned in either the petition or the
    notice of hearing, and there being no appearance at the hearing in behalf
    of the district to which the land belonged, the action of the district court,
    on appeal from the order of the board, in modifying such order by omitting
    therefrom the land thus erroneously included therein, did not constitute an
    excess of jurisdiction, as being a usurpation of legislative power or other-
    wise; the action of the board with reference to such land being a mere
    nullity.

**Who are legal voters.**
    The term "legal voters," as used in the proviso of Laws 1907, c. 188, de-
    fining who may petition in certain cases for an enlargement of a school
    district, must be taken in its ordinary and usual sense, and hence does not
    include women.

Enoch Oppegaard and others appealed to the district court for
Renville county from an order of the board of county commissioners
of Renville county in the matter of a petition affecting Independent
School District No. 40 and common school districts Nos. 35, 41, 43,
94 and 128, on the ground (1) that the county board had no juris-
diction to act; (2) that the county board had exceeded its juris-
diction; and (3) that its action was against the best interests of the
territory affected. The board of county commissioners filed its com-

[1] Reported in 139 N. W. 949.

Note.—The question of the right of women to vote generally is considered in
notes in 21 L.R.A. 662 and 27 L.R.A. (N.S.) 522.

plaint in the district court. Appellants for their answer to the complaint alleged that, in making the order appealed from, the defendant board exceeded their authority and jurisdiction, and included therein lands which were a part of common school district No. 131, and no notice of hearing was posted in that district or ever served upon the clerk thereof or any of the officers therein, and that the district had no notice or knowledge of the hearing.

The appeal was heard before Powers, J., who denied a motion to dismiss the appeal, made findings and affirmed the order of the defendant board, except that the east half of the northeast quarter of section 21, township 116, range 37, should not be included as a part of common school district No. 43, for the reason that it was a part of school district No. 131, and ordered judgment in accordance with the findings. From an order denying defendant's motion for a new trial, Enoch Oppegaard and others appealed. Affirmed.

*Daly & Barnard,* for appellants.

*J. M. Freeman,* for respondent.

PHILIP E. BROWN, J.

1. In the year 1908 certain legal voters residing in Sacred Heart, an incorporated village of not over 2,000 inhabitants and situated in school district No. 40, county of Renville, petitioned the county board, under the proviso of Laws 1907, p. 212, c. 188, for an enlargement of such district. The petition and notice of hearing thereon contained, among other things, a description of the territory sought to be added; but, at the time stated, a certain 80 acres of land, hereafter referred to, was a part of school district No. 131 of the same county, and this land was not included in either the petition or the notice of hearing; neither was any appearance made by district No. 131 on the subsequent hearing. The board, however, in rearranging the districts affected by the change, nevertheless included this 80 in district No. 43, believing that the same was already a part thereof.

On the subsequent appeal from the order of the board granting the petition, the district court affirmed the order, excluding, however, from its operation the 80 above referred to, and on the appeal to this court the appellants, on this branch of the case, raise the question

whether the district court had authority thus to modify the order; their contention being that the district court's power was limited to a review of the action of the board as a whole, with no authority to alter or modify the same if found to be partially erroneous, and that in excluding the 80 as above stated it exceeded its powers and usurped legislative functions. This contention cannot be sustained.

The board's action in including this 80 in its order was without vitality, no jurisdiction having been acquired by it to deal therewith, and its determination with regard thereto was subject to attack in any subsequent action or proceeding. Hence no legislative power was assumed by the district court, because in legal contemplation the 80 was never included in the order; void action being equivalent to no action. All that the district court did was to prune off the dead limbs.

2. The principal question raised by the appellants relates to the sufficiency of the petition in the matter of signatures. R. L. 1905, c. 14, § 1281 et seq., provides for the formation of school districts on petition made to the county board by "a majority of the freeholders, qualified to vote for school officers, residing upon any territory" sought to be incorporated in a district, after notice and hearing, etc. Section 1286 provides that upon petition of "a majority of the freeholders of each district affected, qualified to vote at school meetings," and by like proceedings, the boundaries of a district may be changed. This section was carried into Laws 1907, p. 212, c. 188, without change, except by the addition of a proviso to the effect that, where a district contains a village of 2,000 inhabitants or less, it may be enlarged upon the petition of a "majority of the legal voters residing within such school district," etc.

In the instant case a majority of the male voters of district No. 40 filed a petition in due form for its enlargement; but such petition did not contain the signatures of a majority of all the voters, male and female, of the district, entitled to vote for school officers and upon educational measures, and the appellants claim that it was therefore insufficient.

Before entering upon a discussion of this question the exact point in controversy must be clearly understood. The appellants found

their claims upon the following constitutional provision giving women the right to vote upon certain matters. Const. Art. 7, § 8, provides:

"Women may vote for school officers and members of library boards, and shall be eligible to hold any office pertaining to the management of schools or libraries. Any woman of the age of twenty-one years and upward, and possessing the qualifications requisite to a male voter, may vote at any election held for the purpose of choosing any officers of schools or any members of library boards, or upon any measure relating to schools or libraries, and shall be eligible to hold any office pertaining to the management of schools and libraries."

Now, while this provision may be important in a collateral way, which we will consider later, it is clearly not directly relevant on the concrete question now to be decided, for we have here no question as to the right of women to vote. That question is absolutely determined by the Constitution in plain and clear language.

The precise question before us is: Did the legislature, by using the term "legal voters" in the proviso under consideration, intend to include women, notwithstanding that the subject-matter of the legislation did not involve any election of any kind whatsoever, or any question or measure to be voted for by any one, but related merely to the matter of petitioning the county board to grant a hearing upon the question of increasing the territory of a school district?

At the outset it must be conceded that in this state the ordinary acceptation of the words "legal voters" does not include women. As said by Mr. Justice Mitchell in Slingerland v. Norton, 59 Minn. 351, 357, 61 N. W. 322, referring to the status of women in this regard: "They are voters only for the purpose of electing school officers, and hence are electors only in a limited or qualified sense." We do not mean to say, nor do we think Mr. Justice Mitchell meant to say, that there may not be educational matters other than elections of school officers upon which women, under the Constitution, would be entitled to vote. We mean that in this state women are considered

to be voters only in a qualified sense, and that the term "legal voters," without more, does not include women.

Now R. L. 1905, § 5513, provides that words and phrases not especially defined shall be construed according to the common and approved usage of the language, but technical or other words and phrases, which have acquired a peculiar meaning in the law, shall be given such meaning. See, also, 3 Dunnell, Minn. Dig. § 8968. So, also, in section 8975, the rule is stated as follows: "Words in a statute which have a settled meaning in the law are to be given that meaning unless they were obviously used in a different sense." To the same effect are the rules of statutory construction that language which is plain and unambiguous requires no construction; that if the language embodies a definite meaning, and involves no absurdity or contradiction, literal enforcement is required, the statute being "its own best expositor;" that courts should not nullify obvious requirements by construction; that extrinsic facts can be resorted to in aid of construction only where the intent cannot clearly be ascertained from the statute; and that when we ascertain the true sense of words, the same being their apparent and obvious meaning, we should not seek for others. See 3 Dunnell, Minn. Dig. § 8938.

Unless, therefore, it is apparent that the legislature, when it said "legal voters," did not mean legal voters as ordinarily and properly understood in this state, but intended to include also persons who are legal voters in a qualified sense only, the appellants' contention cannot be sustained, and in a sense it may be said that the appellants had the burden of showing that the legislature did not mean what it literally said.

Let us, then, examine their position. Their claim, so far as it is based upon the Constitution is, we think, plainly untenable, for it involves the fallacy that because the people, by the constitutional provision above referred to, gave women, in plain terms, the right to vote, the legislature must be deemed, therefore, to have given them the right to petition the county board upon a matter claimed to be the same as those covered by the constitutional provision, though the language of the statute does not in terms so provide. In other words, we are not impressed with the argument, if such is intended by the

appellants, that the term "legal voters," as used in the statute declaring who may *petition* the board upon a matter which may here be conceded to concern education, must be held to include all persons who are qualified by the Constitution to *vote* upon educational measures.

The greatest effect that can be given to the constitutional provision, so far as concerns the question before us, is to concede that it indicates a general policy of giving women an equal voice with men in matters purely educational. The question in controversy must, therefore, be determined from the statute itself, though, of course, it is proper to bear in mind any general policy that may be indicated either by the Constitution or other statutes. In the first, and general, portion of the statute, provision is made for the procedure to change the boundaries of school districts in general, and the qualifications of those authorized to petition upon such matters is that they shall be "free-holders qualified to vote at school meetings;" the right of women to vote as conferred by the Constitution being thus qualified by the requirement that they should be "freeholders." In the second, and concrete, portion of the statute, by way of proviso, the right to petition in cases like the one before us is given to "legal voters residing within such school district."

Now, why should the legislature, under the first provision, exclude women unless they are freeholders, and, under the second, give them the general right to petition, whether they are freeholders or not? Certainly it could not be contended that the term "legal voters," as used in the second provision, is synonymous with the whole of the language of the first portion defining the qualifications of petitioners. But, if not, then what warrant is there for leaving off the requirement as to being freeholders? If we are to interpolate the language of the first provision into the second, it would seem that we would have to include all of it. But, this aside, what reasonable explanation can be suggested why the legislature, in declaring who might petition under the first provision, used the phrase "qualified to vote at school meetings," but failed to use it or equivalent language in the portion of the statute here involved? And why, if the appellants' contention is sound, did the legislature, in defining the

qualifications of petitioners under the proviso, use the words "residing within such school district," instead of the words "of the district"? If the act had been thus worded, there would, we think, be better ground for the appellants' contention, or, at least, the question would be more open to debate. Why should we read into the proviso the words "qualified to vote at school meetings," when the legislature, having used them in the main portion of the statute, left them out in the proviso? Why should we say that the words "legal voters" mean, in the connection used, something different from their ordinary and universally accepted meaning?

We should bear in mind that the sole purpose of the petition is to bring the matter before the board for consideration and determination by it, and that at the hearing which must be had the board must hear all evidence, objections, and contentions relevant to the inquiry, but ultimately must determine the question. Gerber v. Board of Commrs. of Wright County, 89 Minn. 351, 94 N. W. 886. The analogy of the constitutional provision giving women the right to vote on educational measures is not, therefore, of much force, and aside from this there is absolutely nothing to indicate that the term "legal voters" was not used in its usual sense, except that under the main and general portion of the statute women are expressly given the right to petition, which alone is, we think, very far short of being sufficient to justify us in declaring that the legislature meant anything except exactly what they literally said.

There is absolutely nothing in the cases cited by the appellants which militates against this conclusion. Indeed, they can hardly be said to be in point. We will, however, refer briefly to three of them.

In Jordan v. Freeborn, 149 Wis. 159, 135 N. W. 751, it was held that the words "adult owners of land" within a drainage district included corporate owners, which holding, so far as this case is concerned, is pertinent only to the proposition that the context and the subject-matter may and should be considered in determining the meaning of terms used in a statute, a proposition which we are not at all inclined to dispute; but it is a far cry from that holding to the contention here made.

In Olive v. School District, 86 Neb. 135, 125 N. W. 141, 27

120 M.—29.

L.R.A.(N.S.) 522, the only questions decided, or even discussed, were that under a statute expressly authorizing women to vote "at any district meeting," women might vote at a "school district meet- · ing" upon the question of a school bond issue, and that such provision was not contrary to a constitutional provision defining "electors" as including men only. "There is no provision in the Constitution," said the court, "that the legislature or the agencies created by statute for the purpose of carrying out the mandate of the people shall not provide means for educating the children of school age in the respective districts unless the voters resident therein shall have authorized the levy of taxes or the creation of a debt for that purpose." Even aside from the fact that the matter involved in that case was *voting* and not *petitioning,* we fail to see how the case is at all in point here.

Finally, in Hall v. Madison, 128 Wis. 132, 107 N. W. 31, it was held: (1) That a *vote* upon a school bond issue was an "election pertaining to school matters," under a statute giving women the right of suffrage in school matters; and (2) that, as this statute in practical effect was a part of the Constitution, the word "electors," as used in a subsequent statute providing that a municipal bond issue should be submitted to the "electors," would be presumed to include women, to whom a general right of suffrage in school matters had been given, when the election was upon the question of a bond issue to build a schoolhouse.

If the question here were upon the right of women to *vote* upon some school measure, under a statute providing for the submission of such matter to the "legal voters" at an election, it might be that the case cited would be in point to the proposition that under our Constitution women would have to be accorded the right to vote in order to save the statute. But such is not the case here. The holding of the case cited, furthermore, is considerably weakened by the strong and able dissent of Mr. Justice Marshall.

We are opposed to reading into a statute, under the guise of arriving at the intention of the legislature, any words or meaning not therein included or clearly thereby intended. Words must at times be supplied, and meaning other than that literally expressed must

sometimes be inferred; but, if possible, the intent of the lawmakers must be gathered from the exact words used by them, especially when the same are clear and unambiguous, and we may not ordinarily declare such intent to be what from other considerations it may be thought or guessed to be. Our knowledge of the views held by the bar generally concerning the construction of the statute in question, as well as the frequency of resort thereto, and likewise as to the financial obligations which may have been incurred thereunder, is limited; but we know that, aside from the instant controversy, the appellants' contentions are by no means universally conceded. We think, furthermore, that it would be our duty to be very slow to give this act a construction which would avoid contracts affecting school districts enlarged under the act in the manner adopted in the instant case, and the question now before us should be ruled by the same considerations.

All true men are disinclined to restrict women in the exercise of any civil right which, after long and unjust denial, has been restored to them. Whether this results from consciousness of tardy reparation, or from a belief, entertained by many, that full justice has not yet been accorded, or from what other causes that may be, we need not here stop to inquire; but we must refuse to usurp the functions of the legislature in order to confer by indirection a privilege which we cannot fairly say under the legitimate rules of statutory construction has been granted.

Order affirmed.